[Crim. No. 18013. Second Dist., Div. Two. Sept. 23, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL HARRISON PARGO, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—Defendant was charged in a two-count information with selling heroin on the 16th and 18th of April, 1969. It was further alleged that he had prior to that date suffered seven prior felony convictions as follows: (1) robbery in Missouri in 1938, (2) robbery in Alameda County in California in 1943, (3) escape in Marin County in California in 1952, (4) violation of section 11500 of the Health and Safety Code in Los Angeles, California, in 1955, (5) violation of section 11500 of the Health and Safety Code in Los Angeles, California, in 1957, (6 & 7) two counts of violation of section 11501 of the Health and Safety Code in April 1960, in Los Angeles.

Defendant was arraigned on the information and pleaded not guilty, denied the allegations of the priors and the matter was first set for trial on August 14, 1969.

Defendant made a motion for discovery on July 17, 1969, but at his request the matter was subsequently continued a number of times until finally on December 10, 1969, the matter proceeded to trial. On that date defendant made a pretrial discovery motion during which testimony was taken from the investigating officer. The defendant admitted six prior convictions after the prosecution moved to strike the first alleged prior.

After hearing testimony of the police officer (the chemist's testimony having been stipulated to) and hearing defendant's testimony, the court sitting without a jury found defendant guilty as charged in both counts of the information.

On the date set for motion for new trial and probation and sentence, the defendant was permitted to withdraw his admission of the priors. In an act of extreme leniency, apparently concurred in by the deputy district attorney, the court made no finding as to the priors and the defendant was sentenced to the state prison.

Officer Paniccia, a member of the Los Angeles Police Department, testified that on April 16, 1969, and on April 18, 1969, he contacted the defendant at an apartment located at 702½ Fifth Street in the City of Los Angeles, and on each occasion the defendant sold him heroin for $10. Although defendant denied being at the described apartment on either the 16th or 18th of April, contending "I hardly ever come downtown, sir," the fact remains that the defendant was arrested in this very same room on May 27, 1969. At the time of the arrest according to Officer Paniccia the defendant appeared to be about ready to "fix." Defendant's arm was tied off with a red scarf and a hypodermic needle was found on the floor by the bed. Defendant had needle marks and scabs on his arm.

When asked if he knew anyone who lived at the location of the arrest, defendant testified, "Yeah. I used to know a guy who lived there who used to run the hotel, and I used to go up there and see him. Him and I was in solitary together." Further, the defendant testified "I'm not doubting that he [Officer Paniccia] didn't get something from somebody in that hotel, because that hotel is packed with narcotics offenders . . ." The defendant denied making the sales of heroin to the officer and denied having been at the location except on the day of the arrest. Defendant alleged the officer recovered the above referenced needle on the street in front of the hotel and not in the room as the officer testified.

Officer Paniccia at one point in his testimony stated that a shirt which the defendant was wearing in court appeared to be the same shirt that he was wearing when he first contacted him on April 16, 1969. The defendant countered by contending that on the date of the arrest, the officer made him put this shirt on and that he had never seen it before the day of his arrest.

■ We set out the facts of the case and some of the conflicts in the testimony in great detail as a background for our discussion of the single point which is here raised on appeal and that is whether this conviction must be reversed for the officer's failure to comply with the requirement first enunciated in *Eleazer* v. *Superior Court,* 1 Cal.3d 847 [83 Cal.Rptr. 586, 464 P.2d 42].

The officer testified that at the time of the two purchases of heroin from this defendant he was accompanied by one Larry Stine, an informant. This officer and this informant are the same parties involved in the *Eleazer* case.

At the hearing on the discovery motion, Officer Paniccia testified that he had not seen Stine for about five weeks and that he did not know where or how to contact him.

The case at bar was tried prior to the Supreme Court's opinion in *Eleazer* which announced a new rule for police in their conduct in dealing with informants to the effect that the police should make such inquiries and arrangements as are reasonably necessary to enable the prosecution and defense to locate the informant. "Due process requires only that the police and the district attorney undertake *reasonable efforts* in good faith to *locate* the informer so that either party or the court itself (see Evid. Code, § 775), could, if it so desired, subpena him as a witness." (*Eleazer* v. *Superior Court, supra,* at p. 853.) The court carefully pointed out that this rule did not require efforts to *produce* the informant. In a footnote, the Supreme Court further indicates that this duty on the part of the prosecutor or the police applies only to an informer "who regularly supplies

information to the law enforcement agency, or who is compensated for the furnishing of information." (*Eleazer* v. *Superior Court,* fn. 10, p. 853.)

Whether the witness is in fact located or produced is not the test. *Eleazer* clearly envisions the possibility that there will be trials in which a material witness will not be produced or will not even be reachable in spite of reasonable efforts by the police or the prosecutor to locate him. Furthermore, if the rule applies only to paid informers then there will be situations where the police or the prosecutor will be under no duty to make reasonable efforts to locate material witnesses.

Significantly, in *Eleazer* the Supreme Court denied prohibition and permitted the case to proceed to trial stating "Under these circumstances, and in view of the fact that prior decisions did not set forth clearly the duty of the prosecution to make a reasonable effort to locate an informer who is a material witness, dismissal of the information is not warranted; the People should be afforded an opportunity to comply with this ruling by attempting to locate Mr. Stine." (*Eleazer* v. *Superior Court, supra,* at p. 854.)

We read this as meaning that a conviction will stand even if the efforts to locate Stine are fruitless. At this late date the latter appears to be quite probable. We are faced with the determination of whether "in view of the fact that prior decisions did not set forth clearly the duty of the prosecution . . ." a reversal of conviction is any more warranted than was dismissal of the information in *Eleazer.*

All that compliance with *Eleazer* could accomplish (assuming that on a retrial Stine could be located) would be to provide defendant with a lead to Stine's whereabouts. There is nothing in the record to indicate that defendant would necessarily call Stine as a witness.

In this connection it is interesting to note that there were four other persons in the room at the time of the arrest of the defendant. Apparently, all of them were associates or compatriates of the defendant and yet he did not produce any of them to testify on matters such as the finding of the needle or the wearing of the shirt, matters in which defendant controverted the officer's testimony. Furthermore, defendant in allowing his discovery motion to lie dormant from July 17 until December 10, contributed to the inability of the officer to provide the requested information.

The evidence of Pargo's guilt is overwhelming. The trial court afforded full credibility to Officer Paniccia's testimony. The trial court, the prosecutor and the police fully complied with the law as it existed at the time. We are not disposed to conclude that a new procedural rule announced

by the court, retroactively turned a perfectly proper trial and conviction into a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

As Mr. Justice Gardner, speaking for the Fourth District, so eloquently stated in *People* v. *Helmholtz* (1970) 10 Cal.App.3d 441 [88 Cal.Rptr. 743], "Since the instant case comes before us on direct appeal after a conviction, we are not allowed the luxury of sending it back to allow the prosecution to comply with the new rule. Ours is a simple black or white determination—affirm or reverse."

In *Helmholtz, supra,* the court very carefully analyzed the *Eleazer* decision in light of the three-pronged test established in *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967],[1] to determine whether or not a newly discovered right should have retroactive application.

"*Desist* v. *United States,* 394 U.S. 244, 251 . . . , makes it clear that if the purpose of the [new] rule *clearly favors* retroactivity, it will be so declared and the court will not undertake to weigh the factors of *reliance* by law enforcement and *subsequent burden* on the administration of justice.

"Obviously, in the instant case, we are dealing with the problem of confrontation. However, we are dealing with it in an indirect way. While the purpose anticipated by the new rule is the enhancement of the integrity of the fact finding process by adding a new dimension to the duty of the prosecution to make available a potential witness, this is not to say that the old rule denied confrontation and the new rule provides for it. If this were the case, we would simply say that the new rule clearly favors retroactivity. A denial of the right of confrontation obviously denies a fair trial and due process of law. (*People* v. *Kiihoa,* 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673].) However, the old rule did not deny confrontation—rather, it provided for confrontation. There was nothing fundamentally unfair about pre-*Eleazer* practices. The new rule merely modified the old rule by enlarging the possibility of effective confrontation. Thus, we hold that the purpose of the new standard does not clearly favor retroactivity. . . .

"In our opinion the effect on the administration of justice of a retroactive application of the *Eleazer* standards would be devastating . . . from the standpoint of the number of cases involved.

---

[1] The three criteria are: (a) The purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards.

"But further, retroactive application of the *Eleazer* rule would present the court system with a further practical problem. . . . Were *Eleazer* type cases to be returned for retrial, the chances of locating the average informer would be slim. Thus, were *Eleazer* to be applied retroactively, a further question would present itself: When does the prosecution have the burden of exercising its good faith attempt to locate him?

"Were the courts to opt for the date of retrial, the system of criminal justice would be forced into indulging an exercise in futility, unlikely to inure to the benefit of the defendant. The informer will be gone—as in the instant case. The prosecution can attempt in the utmost good faith to locate the informer, all to no avail, and the most diligent efforts will not benefit the defendant in the slightest.

"Alternatively, were the courts to select as the applicable date that of the original trial, the result would almost invariably be a dismissal of a case against a defendant who has been found guilty by established standards, for rarely could the prosecution represent in good faith that it had undertaken reasonable efforts to locate the informer. A holding of retroactivity could be made only with a cavalier disregard for the realities of the administration of criminal justice. Therefore, we hold that *Eleazer* applies only to cases which were tried after January 30, 1970." (*People v. Helmholtz, supra,* pp. 448-450.)

We agree but feel that another dimension must be added. There may be cases tried after January 30, 1970, in which the prosecution is unable to comply with *Eleazer* because contact has been lost with the informant prior to January 30, 1970. In the instant case we would affirm the conviction even if the trial had commenced after January 30, 1970. Logically the application of *Eleazer* should be directed to the time of the last contact with the informant at which the police could have acquired the information demanded by *Eleazer*.

While the court may in trials beginning after January 30, 1970, require the prosecution at that time to make reasonable efforts to locate the informant it should not be fatal to a successful prosecution if those efforts are rendered fruitless by the fact that the last meaningul contact with the informant occurred prior to the time that the police were required to obtain and provide the additional information. (See *People v. Fortier* (1970) 10 Cal.App.3d 760 [89 Cal.Rptr. 210].) In this conclu-

sion, we parallel the result reached by the Supreme Court of the United States in dealing with the lineup requirements of *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. (*Stovall* v. *Denno, supra,* 388 U.S. 293.)

The judgment is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied November 18, 1970. Peters, J., was of the opinion that the petition should be granted.